HARRIETT, The (MYERS v.). See Case No. 9,992.

HARRILL (UNITED STATES v.). See Case No. 15,310.

## Case No. 6,104.

### The HARRIMAN.

[5 Sawy. 611.] [1]

Circuit Court, D. California. Nov. 4, 1867. [2]

CONSTRUCTION OF CHARTER-PARTY — WHEN FREIGHT NOT EARNED — DEPARTURE OF CONSIGNEE FROM PORT OF DESTINATION—NO FREIGHT WITHOUT FULL PERFORMANCE — CONTRACT BY CHARTER-PARTY AN ENTIRETY—FAILURE TO PERFORM — WHEN RISK AND DANGER OF VOYAGE A DEFENSE.

1. Where, in accordance with a charter-party, the vessel chartered was to proceed with a cargo from San Francisco to Valparaiso and report there to the commanding officer of the Spanish fleet and discharge at such port as he should name, and afterwards the charterer consented that the vessel might call at the Chincha Islands, and, if it met the commander there or at any other point, might discharge as he might order; and the vessel, having proceeded to the Chinchas, and the master learning there that the Spanish fleet had left Valparaiso badly shattered, returned to San Francisco without going to Valparaiso or meeting the Spanish commander, held, that the contract had not been performed; that its performance had not been waived by the fact that the Spanish commander or fleet had left Valparaiso, and consequently that no freight had been earned.

[See note at end of case.]

2. The departure of the consignee named in a charter-party from the port of destination constitutes no waiver of the contract—such contract being not to find the consignee but the port of delivery.

3. Freight being the compensation for the carriage of the cargo, if the carriage is not made the freight is not earned.

4. The contract by a charter-party for the carriage of a cargo to a certain port being an entirety, it must be executed completely or no claim for compensation arises. In case of failure it is immaterial whether the failure of the carrier arises from his fault or his misfortune.

[See note at end of case.]

5. The risk and danger of losing a cargo in performing or attempting to perform a stipulated voyage may be shown in answer to a claim for damages preferred by the shipper for breach of the contract, but such risk and danger will not entitle the carrier to any compensation for partial performance.

[See note at end of case.]

[Appeal from the district court of the United States for the district of California.]

On the seventh of May, 1866, C. J. Jansen, the owner of the ship B. L. Harriman, chartered her to Joseph Emeric, the libellant, for a voyage from San Francisco to Cobija,

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

[2] [Affirmed in 9 Wall. (76 U. S.) 161.]

Bolivia, or other ports in the Pacific, the port of discharge to be designated before the sailing of the vessel. The charter-party provided that instructions for the vessel should be given by letter in triplicate, and if the vessel proceeded pursuant to them direct to Valparaiso, the commanding officer of the Spanish navy, who was supposed to be at that port, should have the right to receive a portion of the cargo there, or the whole of it, or to decline to receive any portion there, and to send the ship to another port in Chili, Peru or the Chincha Islands; and, in such case, that the vessel should proceed immediately to the port named by him, and there complete her discharge. The charterer, on his part, agreed to provide the vessel with a cargo of coal of seven hundred and eighty-six tons, and to pay for the use of the vessel during the voyage fifteen dollars per ton, in gold coin of the United States, one half to the owner at San Francisco two days after the sailing of the vessel, less two and a half per cent. discount for cash, and the other half to the owner on receipt of a canceled bill of lading that the coal had been delivered. On the fourteenth of May the charterer wrote to the master of the ship a letter, designating the first port of Valparaiso as the port to which he was to proceed with his vessel on leaving San Francisco, and directing him when there to report himself to the commanding officer of the Spanish navy, and stating that such officer would have the right to take the whole of the cargo, or a portion of it, or to refuse to take any portion, and to send the vessel to another port, as mentioned in the charter party. On the seventeenth day of May the charterer wrote to the master a second letter, stating that since addressing his previous letter he had received from Panama what he terms "an instruction," which he incloses. This instruction is an extract from a letter of his correspondent requesting him. if he had not attended to all outstanding orders, to suspend operations until further orders, giving as a reason that it was probable that the Spanish naval forces might have changed their base of operations; but directing him, if he had taken up a vessel before receiving the letter, to "instruct the ship to seek after the fleet between the port of Valparaiso and the Chinchas." The charterer added to the extract a request that the master would follow the instruction so far as was in his power. On the nineteenth of May the charterer sent another communication to the master, informing him that in case the wind, weather or other circumstances favored his making the Chincha Islands, he was at liberty to call there, without, however, prejudicing the charterer's rights under the charter-party and instructions. The vessel sailed from San Francisco on the twenty-second of May and arrived at the Chinchas on the third of August. Whilst there the master was informed of the bombardment of Callao on the second of May, and that the Spanish fleet had sailed

away badly shattered. On the same day a regular Chilean mail steamer arrived and reported that all was quiet at Valparaiso, and that nothing was known of the Spanish fleet. After remaining a few hours at the Chinchas the vessel left, and the captain immediately ordered her back to San Francisco, where she arrived on the sixth of October. On the eighth he made a formal protest and served a copy on the charterer. The owner then insisted that he was entitled to the full freight which was stipulated for the performance of the voyage, and called upon the charterer to receive the cargo, discharge the vessel and pay the balance of the freight claimed. To this demand the charterer refused to accede, alleging that the voyage agreed upon had not been performed. The ship-owner thereupon paid the duties upon the cargo, discharged the vessel and had the coal sold. The charterer then libeled the vessel for breach of the charter-party and the conversion of the cargo to the owner's use. The district court held that full freight had been earned by the ship, and entered a decree in favor of the charterer for the residue of the proceeds of the sale of the coal, after charging him with the expenses of sale and commissions. From this decree the libellant appealed; and two questions were presented for determination: (1) What was the contract between the ship-owner and the charterer? and (2) was that contract performed by the ship or was its performance waived by the charterer or prevented by his fault or omission?

Doyle & Barber, for appellant.
Wm. H. Sharp and S. M. Wilson, for respondent.

FIELD, Circuit Justice. The charter-party provided for a voyage to any port of the Pacific, to be named before the sailing of the vessel, and for written instructions upon this point. These instructions were given in the letter of May 14, and the port of Valparaiso was named. The contract thus became, in this particular, clear and explicit. The charter-party stipulated for the exercise of certain rights over the coal and vessel by the commander of the Spanish navy at Valparaiso, and the instructions repeated the stipulation, and directed the master of the vessel when there to report to him. Both documents were evidently drawn upon the supposition that the Spanish commander was at the time at the port of Valparaiso, and would be found there on the arrival of the vessel. No serious question could be raised upon these documents standing alone. A change in the contract thus accepted and a new destination of the vessel are supposed to have been effected by the letter of May 17. But that letter only directed the master of the vessel to seek the Spanish fleet between Valparaiso and the Chinchas. It was an instruction founded upon the supposition that the fleet might have

changed its base of operations. There was no certain knowledge that such change had taken place; it was suggested as a possibility only, in consequence of which the vessel was to seek for the fleet in passing between the Chinchas and Valparaiso. The contract to proceed to Valparaiso was not abandoned. None of the parties concerned understood the letter as changing the port of destination. The master did not so understand it. In his protest, after his return. he declared that his vessel left San Francisco bound for the port of Valparaiso via the Chincha Islands. He did not pretend that he had made the voyage for which the charter-party stipulated, but contended that the voyage was broken up and his return to San Francisco justified by the withdrawal of the Spanish fleet from the coast of Chili and the absence of its commander, the consignee of the cargo.

The owner of the ship did not so understand the letter. He assumed in a communication to the charterer, written on the sixteenth of June, nearly a month after he had learned of the departure from Valparaiso of the Spanish fleet, that the vessel was obliged under the contract, to proceed to that port, for he mentioned that no provision was made in the charter for the possibility of there being nobody to receive the cargo on the arrival of the ship, and asked for instructions in that event to communicate to the captain.

The charterer did not so understand the letter. He only requested a compliance with the suggestion of his correspondent so far as it was in the master's power, and in his communication of May 19, he accompanies his permission to touch at the Chinchas, with the stipulation that it should not prejudice his rights under the charter-party and instructions. But besides this, he testifies that at the request of the ship-owner, he wrote to his friends at Panama, his associates or agents in the business of supplying the Spanish fleet, to designate some one at Valparaiso to receive the cargo, in the event that the Spanish commander had left on the ship's arrival. The owner was himself examined as a witness, and no denial of this statement was made.

Thus all the parties concerned construed the contract in the same manner. and did not regard its purport or obligation as in any respect changed by the letter of May 17. We may, therefore, safely treat the letter as simply a request that the captain would comply with the suggestion of the charterer's correspondent at Panama, so far as he could do so consistently with the provisions of the charter-party; and that it neither had, nor was intended to have, any other or greater import. If the vessel had intercepted the Spanish fleet between the Chinchas and Valparaiso, the acceptance at sea of the cargo, or a portion thereof, by the Spanish commander, would have been as valid and binding as, in the absence of the letter of May 17, such acceptance would have been at Valparaiso. But there was no obligation rest-

ing upon the commander to accept at sea the cargo, or any part thereof, or to make there the option given by the charter-party. He could have pointed to that instrument and replied, that he would exercise his rights and privileges thereunder at Valparaiso. The letter simply provided for anticipating, if the Spanish commander consented, the time and place for the acceptance of the cargo, or for directing its partial or entire discharge at some other port.

Such being in our judgment, the obvious construction of the letter of May 17, it follows that the original contract completed by the instructions of May 14, requiring the vessel to proceed to Valparaiso, was not subsequently changed, and as the vessel only proceeded to the Chinchas, such contract was not performed.

But it is contended that performance was waived by the fact that the Spanish commander, the consignee of the cargo, had left Valparaiso; and that the captain was justified in avoiding the risk of possible seizure of the cargo by the authorities at Chili. which it is assumed he must have incurred had he proceeded to that port in the absence of the Spanish fleet.

The departure of the consignee named from the port of destination constituted no waiver of the contract. The contract was not to find the consignee, but to find the port of delivery. It may be that the consignee had appointed agents to appear for him and represent his interests; and if he had not done so the law indicated the course which the master of the vessel could have pursued—he could have stored the cargo at the shipper's risk. The storing in such case would have been, so far as the earning of freight was concerned, the legal equivalent to delivery to the consignee. Suppose, by way of illustration. the case stated by counsel, that the cargo had been consigned to the president of an incorporated company, and while the vessel was at the Chinchas. authentic intelligence had been received that the company had been dissolved, and that the president had absconded to parts unknown; and thereupon the ship had retraced her course back to San Francisco; would it be pretended in such case that the freight stipulated for the entire voyage had been earned? And if freight would not have been earned in that case, why can it be considered earned in this case? The law of the contract is not changed by the fact that the consignee in one case is a naval commander, whose fleet has sailed from the port of destination, and in the other case is the absconding president of a dissolved company. The principle on which the right to freight depends is simple and well settled. Freight is the compensation for the carriage of the cargo. If the carriage be not made the freight is not earned. The contract is an entirety—it must be executed completely, or no claim for compensation arises. Such is the general rule, and

it is immaterial whether the failure of the carrier arise from his fault or his misfortune. Thus if the carriage be prevented by a blockade of the port of destination—whether such blockade were known or not at the time the contract was made—the freight is not earned. The risk or even impossibility of entering the port in such case constitutes no ground upon which compensation can be claimed, though the voyage be in other respects performed. The only exception to the rule that performance must precede the right to compensation is where such performance is prevented by the fault or omission of the shipper.

In Scott v. Libby, 2 Johns. 336, a vessel was chartered for a voyage from New York to the city of St. Domingo and back. The charterer was to pay an entire sum for the whole voyage in sixty days after the return of the vessel. On arriving in sight of St. Domingo the vessel was turned away by a British cruiser on account of the blockade of the port. The vessel thereupon returned to New York, and the owners refused to deliver the cargo until the freight was paid. In an action of trover for the conversion of the cargo, it was held by the supreme court of New York that no freight was due, that the blockade had dissolved the charter-party, and the claim for freight was gone. The case of Burrill v. Cleeman, 17 Johns. 72, is to the same purport.

The risk and danger of losing the cargo in performing or attempting to perform a stipulated voyage may be shown in answer to a claim preferred by the shipper for breach of the contract; but this is a very different thing from the assertion of a right to compensation where the contract is not performed. When compensation is made dependent upon performance there must be performance, however difficult or dangerous. The difficulty or danger may, in some instances, relieve the carrier from more than nominal damages for not performing the contract; but neither will entitle him to the slightest compensation when the performance is not had.

In this case the contracting parties knew of the war existing between Spain and Chili, and the possible risks and dangers to be encountered in the voyage to Valparaiso. The charterer did not guarantee that the port would be safe or warrant that the Spanish naval commander would be there to protect the vessel on her arrival. It is probable that both parties expected that he would at all times be able to extend protection to the vessel; but as they made no provision for a possible disappointment in this expectation, and for compensation upon such event, we do not perceive upon what principle we can interpolate into the contract a provision of that kind, or, which is equivalent to the same thing, allow compensation as if such provision existed.

Suppose, as counsel pertinently inquires, the ship-owner in this case had sued the charterer for freight, could he have alleged performance of the contract? Clearly not, for no such performance was had. Could he have alleged that the performance was prevented by the charterer? Certainly not, for the charterer had done nothing to prevent the execution of the contract, nor had he omitted anything for which he stipulated, either expressly or impliedly. What, then, could the owner have alleged as a reason for not proceeding to Valparaiso?—that the Spanish naval commander was not there? But the charterer did not agree that he should be there; nor did his absence prevent the vessel from entering the port. But, then, there was danger that the cargo might be seized by the Chilean authorities. This possibility of seizure was one of the perils assumed by the contract, and, like a similar danger where the port of destination is blockaded, did not waive the necessity of performance as a condition precedent to compensation.

Our conclusion is that the charter-party was not performed by the ship; that the freight stipulated for such performance was not, therefore, earned; and that the charterer was entitled, upon the arrival of the vessel at San Francisco, to the possession of the cargo and to a return of the advanced freight. Watson v. Duykinck, 3 Johns. 335; Griggs v. Austin, 3 Pick. 20; and Phelps v. Williamson, 5 Sandf. 578. The decree of the district court must therefore be reversed and a decree entered in favor of the libellant for the amount of the advanced freight and the amount of the proceeds of the sale of the coal (after deducting therefrom the duties paid and the expenses of sale), together with interest on both amounts and costs of suit.

[NOTE. On claimant's appeal to the supreme court, this decree was affirmed in an opinion by Mr. Justice Swayne, holding that the contract of affreightment is governed by the same principles as other special contracts. It is an entirety. Difficulty or improbability of accomplishing the undertaking will not avail as a defense. It is the province of courts to enforce contracts. not to make or modify them. Where there is neither fraud. accident, nor mistake, the exercise of dispensing power is not a judicial function. 9 Wall. (76 U. S.) 161.]